IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 07 CR 750 |
| | ) | |
| BENJAMIN MUOGHALU | ) | Judge Virginia M. Kendall |

## MEMORANDUM OPINION AND ORDER

On April 9, 2009, a jury convicted Defendant Benjamin Muoghalu ("Muoghalu") of conspiring to solicit and receive illegal kickbacks in violation of 18 U.S.C. § 371, soliciting and receiving illegal kickbacks in violation of 42 U.S.C. § 1320a-7b(b)(1)(B), and engaging in a scheme to defraud and deprive Aventis Pharmaceuticals ("Aventis") of money and property and Provena St. Joseph's Medical Center in Joliet, Illinois ("St. Joe's") of its right to his honest services in violation of 18 U.S.C. §§ 1341 and 1346. After trial, and days before Muoghalu was to be sentenced, the Government disclosed documents relating to its investigation of Aventis. Pursuant to Federal Rule of Criminal Procedure 33, Muoghalu moves for a new trial based on this newly-disclosed evidence or, in the alternative, for an evidentiary hearing. For the reasons set forth below, the Court denies Muoghalu's Motion.

## BACKGROUND

### I.     The Investigation and Indictment

In April of 2003, two Aventis employees, Katy Kennedy ("Kennedy") and Frank A. Matos ("Matos"), filed in the United States District Court for the Northern District of Illinois a sealed *qui tam* lawsuit against Aventis. The case was originally assigned to Judge Charles P. Kocoras. (*See United States ex rel. Kennedy v. Aventis Pharmaceuticals, Inc.*, No. 03 C 2750.) In their sealed

complaint, Kennedy and Matos alleged that Aventis violated the False Claims Act, 31 U.S.C. § 3729 *et seq.*, by marketing one of its drugs—a blood-thinner called Lovenox—for off-label use, thus causing physicians to submit false claims to Medicare for reimbursement. (*See* No. 03 C 2750, R. 8, Am. Compl. ¶¶ 3-5.)[1] "Off-label" marketing is the communication of information relating to a product not contained in the Federal Drug Administration's ("FDA") approval labeling. (*Id*. ¶ 3.) Kennedy and Matos also claimed that Aventis's behavior resulted in patient deaths and that Aventis offered things of value to physicians and other customers to convince them to prescribe Lovenox. (Am. Compl. ¶¶ 5-6.) On December 21, 2006, after three years of investigation into the civil claim, the United States declined to intervene on Kennedy and Matos's behalf and Chief Judge Holderman lifted the seal as to the Amended Complaint and all matters occurring after his order lifting the seal. (*See* No. 03 C 2750, R. 21.) The case was then reassigned to Judge Matthew F. Kennelly. (*See* No. 03 C 2750, R. 25.)

During the course of its investigation into Kennedy and Matos's claims, the Government uncovered the criminal conspiracy at issue here. In 2001, Muoghalu was the pharmacy director at St. Joe's and a member of St. Joe's Pharmacy and Therapeutics Committee ("the Pharmacy Committee"). (Tr. at 723-24, 638.) A hospital's Pharmacy Committee is typically comprises physicians and is chaired by the director of pharmacy and is responsible for deciding which products are available for physicians in the hospital. (Tr. at 389, 638, 722-25.) This list of available products is known as the hospital's formulary. (Tr. at 388.) Muoghalu's co-conspirator, Joseph Levato ("Levato") was an area business manager for Aventis who managed ten sales representatives responsible for selling Lovenox to hospitals in the Chicago-west region, including St. Joe's. (Tr. at

---

[1]Kennedy and Matos filed an Amended Complaint on May 14, 2004.

371, 381, 386.)  As an area business manager, Levato reported to the regional director, Steve Ross ("Ross")  (Tr. at 378.)

Levato knew that Muoghalu was the pharmacy director at St. Joe's, (Tr. at 388.), and as the pharmacy director, Muoghalu had a role in deciding which products would be on the hospital's formulary.  (Tr. at 388-90.)  In Spring of 2001, one of the sales representatives in Levato's territory told Levato that Muoghalu was considering replacing Lovenox with a blood-thinner made by one of Aventis's competitors, a drug called Fragmin.  (Tr. at 391.)  Levato was worried that if Muoghalu succeeded in making this change, it could affect the sale of Lovenox in the other Provena System hospitals and in hospitals around the country.  (Tr. at 391-92.)  Levato told Ross and, in response, Ross assembled a task force of Aventis employees.  (Tr. at 393.)  As members of the task force, Levato and sales representative, Sherri Beale ("Beale"), met first with Muoghalu and then with his boss, Frank Butler, seeking to convince Muoghalu and Butler to keep Lovenox on St. Joe's formulary.  (Tr. at 397-400.)

Shortly after the meeting in the hospital, Levato and Muoghalu met again, this time without Beale and outside of the hospital—at a Chinese restaurant near Joliet.  (Tr. at 400-401.)  At this meeting, Muoghalu told Levato that he was still considering replacing Lovenox with Fragmin, but that Levato could make the issue go away if he bought Rolex watches for Muoghalu and his wife.  (Tr. at 402.)  Levato told Muoghalu that he could not get him the watches and instead suggested that Muoghalu earn the money instead by doing speaking events for Aventis.  (Tr. at 402-403.)  Muoghalu indicated that he was interested in the speaking events and Levato told him that he would have Beale arrange them.  (Tr. at 403.)  After his meeting with Muoghalu, Levato told Beale to set up speaking events for Muoghalu in her territory.  (Tr. at 404.)

3

Muoghalu, however, was not satisfied and was still considering removing Lovenox from St. Joe's formulary. (Tr. at 405.) In the Summer of 2001, Muoghalu contacted Levato, complaining that Beale had not arranged speaking engagements as quickly as Muoghalu had hoped. (Tr. at 405-06.) Muoghalu and Levato met in Muoghalu's office and, after discussing the Lovenox issue, Muoghalu again told Levato that he could make the problem "go away," this time in exchange for $20,000 in cash. (Tr. at 406.) Levato told Muoghalu that he could not meet this request, but he told Muoghalu that he would discuss the problem with his boss, Ross. (Tr. at 407.)

In response, Ross suggested that he, Levato, and Muoghalu meet for dinner to discuss the Lovenox issue. (Tr. at 407-08.) The three men met at Sullivan's Steakhouse in Naperville, Illinois. (Tr. at 408.) At dinner, Ross asked Muoghalu what his position was on the switch from Lovenox to Fragmin and Muoghalu responded that he was still considering the switch. (Tr. at 409-10.) After some discussion, however, the three reached an agreement in which Ross and Levato would approve ten payments of $2,000 each to Muoghalu. (Tr. at 410-13.) In return, Muoghalu agreed to call the director of pharmacy at each St. Joe's branch hospitals and recommend the continued purchase of Lovenox. (Tr. at 411-13.) Knowing that it would be illegal to pay Muoghalu for recommending the purchase of Lovenox, Ross told Levato to disguise the $2,000 payments to Muoghalu by creating false "speaker events" in Aventis's computer system. (Tr. at 412-14.) These "events" in turn would generate ten checks in the amount of $2,000 each. (Tr. at 413, 487-95.) When Levato told Muoghalu that he only had $18,000 left in his expense account, Muoghalu agreed to accept nine checks instead. (Tr. at 412.) Levato delivered the first nine checks himself. (Tr. at 433.) Both Muoghalu and Levato understood that Muoghalu would not actually be speaking at any of these events. (Tr. at 412-13.)

4

In 2002, Aventis transferred Levato to a different Chicago-area territory, and two other sales representatives, Shari Lendy ("Lendy") and Kathy Prieto ("Prieto"), took charge of the St. Joe's account. (Tr. at 433, 449, 517.) Lendy and Prieto both understood that as the director of pharmacy, Muoghalu held significant influence over the formulary at St. Joe's. (Tr. at 518-19, 551-52.) Once they took over the account, Lendy and Prieto were told by two different supervisors, one of them Ross the other Shetal Bahel, to input false speaking events in the Aventis computer system to generate payments to Muoghalu. (Tr. at 549, 552, 520-21.) Lendy and Prieto did as they were directed, causing Aventis to issue seven checks, totaling $14,000, to Muoghalu. (Tr. at 553-59, 521-27.) Lendy and Prieto each delivered some of the checks to Muoghalu. (Tr. at 527, 559-61.) Like Levato, both Lendy and Prieto understood that Muoghalu was not going to speak to earn this money and neither coordinated, scheduled, or attended these or any other events involving Muoghalu. (Tr. at 512, 527-29, 553, 561.) None of Muoghalu's scheduled "speaking events" actually took place, (*see, e.g.*, Tr. at 578-99.), and Lovenox remained on St. Joe's formulary. (Tr. at 433.) Muoghalu received a total of $32,000 from Aventis employees. (Tr. at 829.)

As a hospital manager, Muoghalu was not allowed to accept money from an outside entity unless he disclosed it on annual conflict of interest forms. (Tr. at 639-40, 644-68, 725-27.) He was also required to inform the hospital if he accepted money from a pharmaceutical company. (Tr. at 645-68.) Despite being informed of these regulations, Muoghalu did not disclose his payments from Aventis or the fact that he had an agreement to speak for Aventis. (Tr. at 644-68, 717, 727.)

On November 14, 2007, nearly a year after the Amended Complaint in Kennedy and Matos's case was unsealed, the grand jury returned a four-count indictment against Muoghalu and Levato. Specifically, the grand jury charged Muoghalu and Levato with conspiring to solicit, pay, and receive

kickbacks, in violation of 18 U.S.C. § 371, and engaging in a scheme to deprive Aventis of money and property and St. Joe's of Muoghalu's honest services in violation of 18 U.S.C. §§ 1341 and 1346. The grand jury also charged Levato with paying kickbacks in violation of 42 U.S.C. 1320a-7b(b)(2)(B), and Muoghalu with soliciting and receiving kickbacks in violation of 42 U.S.C. 1320a-7b(b)(1)(B).

## II.    Discovery and Trial

On November 28, 2007, the Government disclosed to Muoghalu: (1) statements Muoghalu had made to investigators; (2) bank records and other documents; (3) documents the Government received from third parties; and (4) memoranda of interviews with Aventis employees, including Kennedy, Matos, and another former Aventis employee, Julie Fitzpatrick ("Fitzpatrick"). (*See* R. 98, Ex. A.) The interview memoranda stated the name of the civil case that gave rise to Muoghalu's prosecution, the case number, and information that supported Kennedy and Matos's allegations. (*See id*.) Specifically, the interview memoranda detailed allegations of rampant off-label marketing of Lovenox, patient deaths resulting from the use of Lovenox, and misuse of company expense accounts—including giving physicians things of value in exchange for prescribing Lovenox. (*Id*.) The memoranda also set forth Levato's alleged role in these activities. (*Id*.)

On May 12, 2008, after Levato agreed to cooperate with the Government, it sent Muoghalu another set of documents, including a memorandum summarizing Levato's proffer. (*See* R. 98, Ex. B.) Levato stated at his proffer that he had never previously engaged in kickbacks. (*Id*.) In total, the Government turned over nearly 1900 pages of documents relating to the United States Department of Health and Human Services ("HHS") and the FDA's investigation of Muoghalu, Levato, and Aventis. (*See* R. 98 at 3.)

On December 11, 2008, Levato pleaded guilty to one count of conspiracy to pay kickbacks in violation of 18 U.S.C. § 371. (R. 26.) Muoghalu elected to take his case to trial. Prior to trial, the Government moved to exclude "any evidence or argument that this case is motivated not by defendant's violation of the Anti-Kickback and mail fraud statutes, but by off-label marketing of Lovenox by Aventis sales representatives." (R. 30; R. 98, Ex. C.) Because the indictment against Muoghalu was limited to charges of a kickback scheme, not charges of off-label marketing, the Government argued that the Court should exclude as irrelevant any argument or evidence about off-label marketing by Muoghalu or by Aventis employees, including Levato. (*Id*.) The Court granted the Government's Motion. (R. 43; R. 98, Ex. D.)

Despite the Court's ruling, at trial Muoghalu's attorney twice brought up the Government's broader investigation into Aventis's activities. During his opening statement, Muoghalu's attorney stated that "the evidence will show that the Government was investigating Mr. Levato. They were investigating Aventis, because of a number of illegal activities that the company . . . ." (Tr. at 359.) The Court sustained the Government's objection based on its prior ruling on the Government's motion *in limine*. (Tr. at 360.) Muoghalu's attorney also asked FDA Special Agent Tom Harkness ("Harkness") whether, during Harkness's interview of Muoghalu, he told Muoghalu that he was investigating Aventis, not Muoghalu himself. (Tr. at 803.)

On April 9, 2009, after deliberating, the jury convicted Muoghalu of all three counts of the indictment.

### III. Post-Trial

The Court scheduled Muoghalu's sentencing for September 15, 2009. On July 6, 2009, Kennedy and Matos's attorney served a civil subpoena on HHS Special Agent William Luczak

("Luczak"), seeking "any and all documents . . . relating to Aventis Pharmaceuticals, Inc. and the case of United States ex rel. Katy Kennedy et al. v. Aventis Pharmaceuticals, Inc. et al, (Case No. 03 C 2750)." (R. 98, Ex. F.) Luczak provided documents to the Civil Division of the United States Attorney's Office and on September 9, 2009, the Civil Division shared them with the prosecutor in this case. Among these documents were investigative memoranda written by Luczak (the "HHS Memoranda" or "Memoranda") that the prosecutor had not previously seen. On September 11, 2009, without conceding their relevance or the fact that they had been improperly withheld, the prosecutor forwarded the HHS Memoranda to Muoghalu's counsel. (*See* R. 98, Ex. G.)

The HHS Memoranda, dated between December 1, 2003 and May 21, 2009, are informal summaries of the progress of Luczak's investigation into both Kennedy and Matos's civil case and Muoghalu and Levato's criminal case. (*See* R. 98, Ex. G.) The opening memorandum, dated December 1, 2003 (the "December 2003 Memorandum") identifies the source of the allegations as the "Qui tam relators" and states the following:

**Allegations**
The relators allege that Aventis Pharmaceuticals ("Aventis") engaged in off-label promotion of the drug Lovenox and paid remuneration to various physicians to induce them to prescribe Lovenox to their patients. Allegedly, patients [at] Resurrection Hospital and Northwest Community Hospital have died as a result of off-label Lovenox use.

Medicaid beneficiaries at the hospitals cited above have received Lovenox.

This investigation will be worked jointly with the FDA/OCI and the U.S. Postal Service/OIG.

**Concurrent DHHS Investigation**
USDHHS/OI in Miami has an open qui tam investigation on Aventis, 4-03-20219-3. Allegedly, Aventis is one of twelve pharmaceutical companies reported to have represented their products as "non-innovator" drugs rather than "innovator" in order to pay a lesser rebate (11% rather than 15%) to the Medicaid program.

(R. 98, Ex. G.)

The December 2003 Memorandum identifies the potential violations as Health Care Fraud and Kickbacks. (*Id*.)

Later Memoranda discuss the following investigative findings or events: (1) patient deaths linked to the administration of Lovenox in "the catheter lab" had been confirmed; (2) kickbacks from Aventis sales representatives to hospital personnel had been "substantiated"; (3) the Civil and Criminal Divisions of the United States Attorney's Office had accepted the case for prosecution; (4) kickbacks from three Aventis sales representatives to St. Joe's former director of pharmacy had been "substantiated"; (5) Levato and Muoghalu's indictment; (2) Levato's proffer and cooperation with the Government; (3) Levato's guilty plea; (4) the close of the Government's investigation into Kennedy and Matos's civil claims; (5) Muoghalu's conviction by a jury; and (6) Levato's sentence. (*Id*.)

In response to the Government's disclosure, Muoghalu filed this Emergency Motion for a New Trial. In his Motion, Muoghalu argues that: (1) a new trial is necessary because the HHS Memoranda—specifically the December 2003 Memorandum—constitute impeachment evidence that the Government failed to disclose before trial in violation of its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), *Gigilo v. United States*, 405 U.S. 150 (1972), and the Confrontation Clause of the Sixth Amendment; (2) the Court should conduct an evidentiary hearing to determine whether a new trial is necessary on *Brady* grounds; (3) the HHS Memoranda are newly-discovered "reverse 404(b)" evidence that may have led to an acquittal in this case; and (4) the Supreme Court's decisions in *Black v. United States*, 130 S. Ct. 2963 (2010), and *Skilling v. United States*, 130 S. Ct.

2896 (2010), undermine his conviction for honest services mail fraud. For the reasons set forth below, the Court denies Muoghalu's Motion.

**DISCUSSION**

## I. *Brady* and *Giglio*

Muoghalu first argues that a new trial is warranted because the Government failed to disclose evidence before trial that could have been used to impeach Levato. Relying on *United States v. Salem*, 578 F.3d 682 (7th Cir. 2009), Muoghalu contends that the verdict in his case is not worthy of confidence because he had no chance to cross-examine Levato about the information in the HHS Memoranda. Had he known about the evidence in the HHS Memoranda before trial, Muoghalu claims, he would have been able to use it to show that because Levato was under investigation for other instances of kickbacks and for patient deaths, he had a powerful motive to lie and to curry favor with the Government. Without this information, Muoghalu argues, he was unable to confront Levato about other criminal charges he faced and what potential hidden deals he had with the Government in exchange for leniency.

In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process of law where the evidence is material either to guilt or to punishment irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. The duty to disclose applies whether the defendant asks for the evidence, *see United States v. Agurs*, 427 U.S. 97, 107 (1976), and it applies to impeachment evidence as well as exculpatory evidence. *See United States v. Bagley*, 473 U.S. 667, 676 (1985) (citing *Giglio*, 405 U.S. at 154)); *see also United States v. Jumah*, 599 F.3d 799, 808 (7th Cir. 2010). Finally, the duty extends to information known to members of the prosecution team—which includes investigating

10

officers and agents—even if it is unknown to the prosecutor. *See Kyles v. Whitley*, 514 U.S. 419, 437 (1995) (prosecutors have "a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police"); *United States v. Wilson*, 237 F.3d 827, 832 (7th Cir. 2001) (the court "impute[s] to the prosecutor's office facts that are known to the police and other members of the investigation team").

Nevertheless, the duty to disclose evidence under *Brady* is not unlimited. The evidence must also be material. Thus, to receive a new trial based on a *Brady* violation, Muoghalu must show: (1) the prosecution suppressed evidence; (2) the evidence was favorable to the defendant; and (3) it was material to an issue at trial. *See United States v. Daniel*, 576 F.3d 772, 774 (7th Cir. 2009). Suppressed evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434. A defendant has only shown a "reasonable probability" of a different result if "the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Id*. (quoting *Bagley*, 473 U.S. at 678). The Court must examine the effect the suppressed evidence would have had on the outcome of the trial in light of the "full context of the weight and credibility of all evidence actually presented at trial." *See United States v. Silva*, 71 F.3d 667, 670 (7th Cir. 1995).

## A.    Suppression of Evidence

Muoghalu's first hurdle is to prove that the Government failed to disclose the evidence in the HHS Memoranda. *Brady* claims involve "the discovery, after trial of *information* which had been

know to the prosecution but unknown to the defense." *Agurs*, 427 U.S. at 103 (emphasis added). There is no *Brady* violation if the "information was also available to a defendant through the exercise of reasonable diligence," *see United States v. Morris*, 80 F.3d 1151, 1170 (7th Cir. 1996), or if he knew or should have known about the essential facts contained in the allegedly exculpatory evidence. *See, e.g.*, *Coleman v. Mitchell*, 244 F.3d 533, 541 (6th Cir. 2001); *United States v. Zichettello*, 208 F.3d 72, 103 (2d Cir. 2000); *United States v. Bafia*, Nos. 93 C 6666, 88 CR 91-5, 1995 WL 57275, at *2 (N.D. Ill. Feb. 8, 1995) (Kocoras, J.) ("*Brady* is not violated when a defendant already knows of essential facts permitting him to take advantage of any exculpatory evidence."). The defendant does not have to know the specific details of the information, or exactly what it is, as long has he "knew of and had access to the material that contained, or the witness who possessed, such information." *Boss v. Pierce*, 263 F.3d 734, 746 (7th Cir. 2001) (Flaum, J., dissenting) (citing *United States v. Senn*, 129 F.3d 886, 892-93 (7th Cir. 1997) and *United States v. Parks*, 100 F.3d 1300, 1307 (7th Cir. 1996)).

Here, Muoghalu contends that until he received the HHS Memoranda—specifically the December 2003 Memorandum—he was unaware of the following facts: (1) Muoghalu was not the original target of this investigation; (2) the Government had been investigating Aventis and Levato for deaths linked to Lovenox; (3) Aventis officials, including Levato, had been investigated for providing kickbacks to other health care professionals in the Chicago area; and (4) Aventis and Levato were being investigated for other kickback schemes around the country, including one in Miami.

First, Muoghalu has inflated the significance of the information in the HHS Memoranda. When taken in context, the December 2003 Memorandum sets forth Kennedy and Matos's

allegations that Aventis was engaged in off-label marketing of Lovenox and that patients had died as a result. The December 2003 Memorandum also states Kennedy and Matos's allegations that Aventis paid kickbacks to physicians to induce them to prescribe Lovenox to their patients. Finally, the December 2003 Memorandum recognizes that HHS investigators in Miami, Florida were looking into allegations that Aventis and other pharmaceutical companies were engaged in Medicaid fraud.

Thus, the information in the Memoranda does not describe a scheme as far-reaching as Muoghalu claims. It describes the discrete investigation into Kennedy and Matos's claims against Aventis and the criminal investigation that led to Levato and Muoghalu's indictment in this case. The first and only "substantiated" kickback scheme detailed in the Memoranda is the one that led to the charge in this Indictment. The December 8, 2006 Memorandum, for example, states that the former pharmacy director at St. Joe's received approximately $20,000 for speaker events that did not take place. The former pharmacy director took these payments, the memorandum states, "to ensure his/her advocacy of Lovenox at the hospital." (R. 98, Ex. G.) Levato was an area business manager who was only responsible for sales representatives in the Chicago area. There is no evidence suggesting that the Miami allegations are linked to Levato.

While Muoghalu did not have the HHS Memoranda at the time of trial, he knew, or reasonably should have known, the essential facts in the HHS Memoranda at the time of trial. First, the Government turned over memoranda of investigative interviews with Kennedy, Matos, and Fitzpatrick, all which have the civil case name and number at the top indicating that there was a related civil investigation into Aventis and that Muoghalu was not the Government's sole target. With reasonable diligence, Muoghalu could have looked up Kennedy and Matos's civil case and read the unsealed Amended Complaint, which sets forth their allegations against Aventis.

Further, Kennedy and Matos's Amended Complaint, the investigative memoranda, and Levato's proffer contained information substantiating the allegations that Aventis was engaged in off-label marketing of Lovenox, patient deaths resulting from the use of Lovenox, and misuse of company expense accounts. Unlike the HHS Memoranda, this information also gave Muoghalu the allegations necessary to infer that Levato was linked to allegations of wrongdoing. Kennedy, Matos, and Fitzpatrick all reported to Levato when he was area business manager for Aventis and the memoranda contains allegations suggesting that Levato knew about or encouraged off-label marketing and the misuse of company expense accounts. (*See, e.g.*, 03 C 2750, R. 8 ¶¶ 23, 53-56, 36-41 (linking Levato to off-label marketing and kickbacks, including payments to Muoghalu).) There are even facts supporting the inference that Fitzpatrick, and possibly Levato, were fired for off-label marketing and misuse of their expense accounts. (*See, e.g.*, R. 98, Ex. A.) If Muoghalu failed to explore these references to Levato in the interview memoranda and Levato's proffer and failed to take the time to look at the publically-available Amended Complaint in Kennedy and Matos's case, he cannot argue now that the Government withheld this information from him.

Finally, the Government's motion in *limine* and Muoghalu's counsel's statements at trial confirm that Muoghalu actually knew the essential facts contained in the HHS Memoranda. The Government's motion in limine specifically stated that "the government began investigating [Muoghalu] as part of an investigation into the off-label marketing of Lovenox to individuals such as [Muoghalu]." (R. 30 at 5; R. 98, Ex. C at 5.) In the course of that investigation, the Government's motion stated, the Government uncovered the kickback scheme involving Muoghalu. (*Id.*) Moreover, Muoghalu's counsel twice attempted to bring up the Government's investigation of Aventis at trial, once during opening statements and the second time during his cross-examination

14

of Harkness. Finally, Muoghalu's counsel specifically asked Levato whether he had been fired for engaging in illegal activities. (Tr. at 449.)

Because the alleged *Brady* material was available to Muoghalu through the exercise of reasonable diligence and because Muoghalu's counsel actually knew of the general substance of the material, his *Brady* claim fails. *See United States v. White*, 970 F.2d 328, 337 (7th Cir. 1992) ("When defendants miss the exculpatory nature of documents in their possession or to which they have access, they cannot miraculously resuscitate their defense after conviction by invoking *Brady*."). Muoghalu had the essential facts and information necessary to make the arguments he now claims he was unable to make.

### B.     Material to the Case

Even assuming that the Government suppressed evidence and that the evidence would have successfully impeached Levato, the evidence in the HHS Memoranda is not material. Muoghalu admits that his use of the information in the HHS Memoranda would have been limited to the impeachment of Levato. Ordinarily, newly-discovered impeachment evidence does not warrant a new trial under *Brady* because it is often "cumulative of other evidence presented at trial." *See United States v. Salem*, 578 F.3d at 688 (citing *United States v. Reyes*, 542 F.3d 588, 596 (7th Cir. 2008) and *United States v. Ervin*, 540 F.3d 623, 631-32 (7th Cir. 2008)). In some cases, however, where the Government's case "rests 'entirely on the uncorroborated testimony of a single witness,' new impeachment evidence could be material." *Salem*, 578 F.3d at 688 (quoting *United States v. Taglia*, 922 F.2d 413, 415 (7th Cir. 1991)).

Here, Levato was throughly impeached at trial. Muoghalu's counsel cross-examined Levato regarding his bias and his strong motive to testify against Muoghalu. Specifically, the jury knew that

Levato had been investigated for this crime and that he had pleaded guilty to paying Muoghalu kickbacks in exchange for keeping Lovenox on the formulary. (Tr. at 434.) Levato testified that when he was paying Muoghalu, he knew what he was doing was wrong. (*Id*.) The jury heard about Levato's cooperation with the Government in this case and about his plea agreement. (Tr. at 434-36.) It also heard that Levato agreed to testify truthfully in this case in return for a lighter sentence and that the Government had dismissed other criminal counts against him. (*Id*.) Finally, the jury heard that Levato had been fired from his job at Aventis. (Tr. at 449.) At best, the HHS Memoranda contained cumulative impeachment evidence, the suppression of which does not warrant a new trial. *See United States Kozinski*, 16 F.3d 795, 819 (7th Cir. 1994) ("Evidence that impeaches an already thoroughly impeached witness is the definition of 'cumulative impeachment' evidence and its suppression cannot give rise to a *Brady* violation.").

Moreover, unlike the case in *Salem*, the Government's case here did not rise and fall on Levato's testimony. In *Salem*, the defendant was convicted of witness intimidation and possession of a firearm in furtherance of that offense. 578 F.3d at 683. After trial, the government disclosed evidence that its cooperating witness, Carlos Lopez, "was involved in a murder for which he ha[d] never been charged." *Id*. Lopez was the alleged victim and the government's principal witness on both charges against the defendant. *Id*. at 684. Although Lopez's testimony was corroborated "to some extent," he was "the government's *star* witness" and "without him, there simply [wa]s no case at all on these charges." *Id*. at 688.

Here, not only was Levato's testimony sufficiently corroborated by other witnesses and documents at trial, the Government could have made its case without Levato's testimony. Levato was able to provide the background for the conspiracy and describe the events leading up to the

agreement between himself and Muoghalu.  He testified, however, that he was only involved in the first nine payments to Muoghalu, for a total of $18,000, and that he was not involved in the payments that took place after he transferred territories.  Prieto and Lendy confirmed that account.  Prieto and Lendy testified that after Levato changed territories, they took over the St. Joe's account.  Both testified that they knew Muoghalu was an important member of the Pharmacy Committee.  They stated that Ross and Bahel, not Levato, told them to enter false speaking events for Muoghalu and to deliver the checks to Muoghalu.  Both testified that they understood that Muoghalu would not be doing any work in exchange for the payments.  In total, Prieto and Lendy told the jury that they delivered $14,000 in checks to Muoghalu.  Prieto and Lendy, Muoghalu's supervisors, and speaker coordinators at the speaking event sites all testified that none of the speaking events took place.  The Government also introduced documents that supported Levato, Prieto, and Lendy's testimony that Muoghalu was paid for speaking events that did not exist.

Muoghalu's supervisors testified that St. Joe's regularly told Muoghalu that he may not accept money from an outside entity unless he disclosed it on annual conflict of interest forms, and that Muoghalu was also instructed to tell St. Joe's if he accepted money from a pharmaceutical company.  The Government introduced conflict of interest forms completed by Muoghalu, in which he failed to disclose that he had received money from Aventis or that he had an agreement to speak for Aventis.  While Levato may have been the only witness who testified that the kickbacks were Muoghalu's idea, even without Levato's testimony, the Government successfully proved that Muoghalu accepted $32,000 from Aventis in exchange for agreeing to keep Lovenox on St. Joe's formulary and that he failed to disclose this information to St. Joe's.  Muoghalu has not shown that

there is a reasonable probability that, had he received the HHS Memoranda before trial, the result would have been different.

Because Muoghalu has failed to prove that the HHS Memoranda were suppressed or that they are material to his case, the Court denies Muoghalu's Motion for a New Trial on *Brady* grounds. For the same reasons, and because the record on the Government's investigation into Levato is complete, the Court denies Muoghalu's Motion for an Evidentiary Hearing.[2]

## II. Reverse 404(b) Evidence

Muoghalu next argues that a new trial is warranted because the newly discovered evidence would be admissible as "reverse 404(b) evidence." A motion for a new trial based on newly-discovered evidence is only appropriate if the defendant can show that the evidence: (1) was discovered after trial; (2) could not have been discovered sooner with due diligence; (3) was material and not simply impeaching or cumulative; and (4) if presented at a new trial[,] would "probably result in acquittal." *United States v. Reyes*, 542 F.3d 588, 596 (7th Cir. 2008) (quoting *United States v. Palivos*, 486 F.3d 250, 255 (7th Cir. 2007)).

"Reverse 404(b) evidence" is evidence of prior crimes that is "admissible for defensive purposes if it tends, alone or with other evidence, to negate the defendant's guilt of the crime charged against him." *See United States v. Savage*, 505 F.3d 754, 761 (7th Cir. 2007) (citation omitted); *United States v. Seals*, 419 F.3d 600, 606 (7th Cir. 2005). Muoghalu argues that the evidence of

---

[2]Muoghalu argues that the record is "woefully incomplete" about other Government investigations into Levato's behavior. (R. 103 at 8). Yet, before trial, the prosecutor asked the HHS and the FDA to send her all the information it had relating to the Government's investigation into Aventis, Muoghalu, and Levato. This information was provided to Muoghalu. After the trial, responding to a broad civil subpoena asking for all documents relating to Kennedy and Matos's case, the HHS sent the prosecutor even more information, which she forwarded to Muoghalu. As the Court found, the HHS Memoranda did not give Muoghalu any new information. Muoghalu's claims that Levato was facing other criminal charges or that Levato and the Government entered into other agreements beyond the plea agreement in this case are purely speculation, which does not warrant an evidentiary hearing.

prior acts of bribery by Levato and other Aventis employees demonstrates Levato's *modus operandi* of initiating kickbacks and bribery schemes. According to Muoghalu, if he had been able to cross examine Levato on Levato's prior acts of bribery, his credibility would have been undermined and the jurors would have been left with enough reasonable doubt to acquit Muoghalu. Further, Muoghalu argues, this information "establishes a plausible explanation for Mr. Muoghalu's conduct." (R. 95 at 13.)

Again, leaving aside the liberties Muoghalu takes with the information actually in the HHS Memoranda and whether he could have uncovered the essential facts in the Memoranda sooner with due diligence, Muoghalu cannot meet the materiality requirement necessary for the grant of a new trial. As discussed above, Levato was an important witness, but certainly not the only witness that testified about Muoghalu's wrongdoing. The Government proved that Aventis paid Muoghalu $32,000 not for legitimate speaker fees, but for illegal kickbacks. Any suggestion that Levato routinely engaged in this behavior would have no impact on Muoghalu's conviction. For these reasons, Muoghalu's Motion for a New Trial based on "reverse 404(b) evidence" is denied as well.

## III.    Honest Services Mail Fraud

Finally, Muoghalu argues that the Supreme Court's decisions in *Black v. United Sates* and *Skilling v. United States* also warrant a new trial. Both cases presented the issue of what conduct Congress rendered criminal by proscribing, in § 1346, fraudulent deprivation of "the intangible right of honest services." *See Black*, 130 S. Ct. 2963, 2968 (2010). In *Skilling*, the Court confined the reach of 18 U.S.C. § 1346, the honest-services-mail-fraud statute, to schemes to defraud that involve bribes or kickbacks. 130 S. Ct. 2896, 2331. The Court characterized this type of scheme as the "solid core" of the statute. *Id*. at 2930. The Court thus removed from coverage cases involving

undisclosed financial self-dealing, explaining that such cases raise due process concerns. *Id*. at 2932.

In *Black*, the Court held that the defendants secured their right to challenge the incorrect honest-services jury instructions on appeal by properly objecting to the instructions at trial. 130 S. Ct. at 2970.

The Government objects that Muoghalu's challenge to his honest services mail fraud conviction is untimely. A motion for a new trial for any reason other than newly discovered evidence must be filed within fourteen days after the verdict. Fed. R. Crim. P. 33(b)(2). Muoghalu's argument is based on intervening case law, which does not qualify as "newly discovered evidence" under Rule 33. *See, e.g.*, *United States v. Patterson*, No. 04 CR 705-1, 2007 WL 1438658, at *18 (N.D. Ill. May 15, 2007) (Pallmeyer, J.) ("Defendant cites to no authority holding that a court decision falls within the "newly discovered evidence" rubric . . . ."); *United States v. Getty*, No 97 CR 835, 1999 WL 1024518, at *1 (N.D. Ill. Nov. 5, 1999) (Castillo, J.) (denying the defendant's untimely post-trial motion in which the defendant argued that an intervening Supreme Court decision rendered the court's jury instructions faulty). The time limitations in Rule 33 are "claim processing" rules, not jurisdictional rules, but the Court may not grant a motion for new trial that is untimely under Rule 33 if the prosecutor objects. *See Eberhart v. United States*, 546 U.S. 12, 19 (2005) (Rule 33's time limitations "assure relief to a party properly raising them"); *see also United States v. Cavender*, 228 F.3d 792, 802 (7th Cir. 2000) (affirming the district court's denial of a new trial because the defendant filed his motion outside the time limits contained in Rule 33).

Here, Muoghalu asked for, and received, three extensions of time to file post-trial motions. (*See* R. 74-75, 67, 66.) Nevertheless, he did not file any motions—challenging his conviction for honest services mail fraud or otherwise—by the final deadline, even though the Supreme Court

granted *certiorari* in *Black* on May 18, 2009, before Muoghalu's deadline passed.  Further, the

Court's acceptance of Muoghalu's Emergency Motion for a New Trial Based on Newly Discovered

Evidence cannot be construed as a further extension of time in which to file all Rule 33 motions.

The Court was clear when it allowed supplemental briefing that this Motion is limited to the newly-

discovered-evidence issues.  Muoghalu cannot use the Government's late disclosure of documents

as an opportunity to address an unrelated substantive issue.  For those reasons, Muoghalu's Motion

for a New Trial based on the Supreme Court's decisions in *Skilling* and *Black* is dismissed as

untimely.[3]

---

[3]Even if the Motion was timely, however, Muoghalu's conviction for Count IV of the Indictment was for both mail fraud and honest services mail fraud in violation of 18 U.S.C. §§ 1341 and 1346.  (*See* R. 1, Indictment at 10-12; R. 59, Jury Verdict.)  Specifically, using a special verdict, the jury found both that Muoghalu "engaged in a scheme to defraud victim(s) of money or property" and that Muoghalu "engaged in a scheme to defraud victim(s) of the intangible right to honest services."  (*See* R. 59.)  While Muoghalu's conviction under § 1346 for honest services mail fraud may not stand after *Skilling* because the conviction was based on his failure to report a conflict of interest to St. Joe's, *see Skilling*, 130 S. Ct. at 2932,  his conviction under § 1341 for traditional mail fraud does still stand because it was based on Muoghalu's deprivation of money and property from Aventis.  Thus, despite *Skilling*, Muoghalu's conviction as to Count IV still stands.  *C.f. id*. at 2935 (citing *Yates v. United States*, 354 U.S. 298 (1957) and finding the defendant's conviction flawed because the jury was instructed on "three objects of the conspiracy—honest-services wire fraud, money-or-property wire fraud, and securities fraud" and the jury returned a general verdict that may have rested on a legally invalid theory).

## **CONCLUSION**

For the reasons stated, Muoghalu's Motion for a New Trial Based on Newly Discovered Evidence and for an Evidentiary Hearing is denied.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: August 9, 2010